IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

KENT DISTRIBUTORS, INC.,  §
    *Plaintiff,*  §
      §
v.  §
      §        **MO:22-CV-00221-DC**
      §
TRAVELERS CASUALTY AND  §
SURETY COMPANY OF  §
AMERICA,  §
    *Defendant.*  §

## ORDER

Before the Court is United States Magistrate Judge Ronald C. Griffin's Report and Recommendation filed in the above-captioned case on August 3, 2023,[1] in connection with Travelers Casualty and Surety Company of America's Motion to Dismiss for Failure to State a Claim.[2] After due consideration, the Court **ADOPTS** the R&R in its entirety and **GRANTS** Traveler's Motion to Dismiss.

### FACTUAL BACKGROUND

The parties dispute whether a crime policy issued by Travelers covers a forgery scheme that duped Kent's check cashing services into cashing federal income tax refund checks and pandemic relief checks that were later reclaimed by the United States Treasury. In the first few months of the COVID-19 pandemic, fraudsters stole checks from apartment complex mailboxes in the Houston, Texas area, fraudulently endorsed those checks, and cashed them in person at Kent Distributors, Inc.'s "Mr. Payroll" check cashing services

---

[1] ECF No. 16.
[2] ECF No. 13.

using fake drivers' licenses and social security cards. Apparently not yet aware of the fraud scheme, Kent turned to the United States Treasury for reimbursement. For a brief period, these reimbursements went without a hitch. Then, in May 2020, the Treasury realized that the refund and relief checks never reached their intended recipients and sent Kent a series of reclamation notices—ultimately drafting $74,091.75 from Kent's bank account to that end.

Kent, now very much aware that it had been defrauded, notified Travelers of the loss and sought a claim resulting from the provisions concerning social engineering fraud, on-premises theft, and forgery or alteration in the crime policy it purchased. Travelers refused. It argued (and continues to argue in its Motion to Dismiss and subsequent briefing) (1) that the policy excludes loss from cashing fraudulently endorsed checks in this situation, (2) that the checks are not "covered instruments" as defined by the policy, and (3) that Kent's losses were too indirect for the policy's forgery coverage to apply. Kent then sued for breach of contract, breach of implied duty of good faith and fair dealing, and insurance code violations.[3]

On December 19, 2022, Travelers filed its Rule 12(b)(6) Motion to Dismiss.[4] In addition to the arguments Travelers made when it refused coverage, Travelers here argues (1) that Kent failed to state a claim under the forgery insurance provision because the fraudster's checks were not "made by, drawn by, or drawn upon" Kent or its agents, (2) that Kent failed to state a claim under the on premises insurance provision because the fraud alleged does not amount to "theft" under the policy, and (3) that Kent fails to state a claim

---

[3] ECF No. 11 at 6–9. As to the insurance code violations, Kent alleges Travelers violated the Texas Insurance Code's prompt payment statute and alleges unfair or deceptive acts or practices under the Texas Insurance Code.
[4] ECF No. 13.

under the social engineering fraud provision because the fraud did not involve a "communication" and therefore Kent did not suffer a direct loss caused by social engineering fraud. The parties fully briefed the motion for the Magistrate Judge[5]. The parties have now fully briefed their objections.

STANDARD OF REVIEW

## I.      The Report and Recommendation

A party may contest an R&R by filing written objections within fourteen days of being served with a copy of the R&R.[6] A party's objections to an R&R entitle it to a de novo review of those claims by a district court.[7] But objections must specifically identify those findings or recommendations to which the party objects.[8] The district court need not consider frivolous, conclusive, or general objections.[9]

Both parties timely filed their objections within the fourteen-day deadline.[10] Kent objects to the Magistrate Judge's findings (1) that, "because the forged checks were not 'made by, drawn by, or drawn upon'" Kent, the forgery or alteration provision does not cover the loss, (2) that, because the forged checks were not communications under the policy definition, the social engineering fraud provision does not cover the loss, and (3) that the voluntary parting exclusion "does not require that the parting be voluntary."[11] Kent also

---

[5] The matter was before the Magistrate Judge through a Standing Order pursuant to 28 U.S.C. § 636 and Appendix C of the Local Court Rules for the Assignment of Duties to United States Magistrate Judges.

[6] *See* 28 U.S.C. § 636(b)(1).

[7] *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(3).

[8] FED. R. CIV. P. 72(b)(2).

[9] *See Battle v. U.S. Parole Comm'n*, 834 F.2d 419 (5th Cir. 1987).

[10] ECF Nos. 17, 18.

[11] ECF No. 17 at 7, 8.

conditionally objects to Magistrate Judge's findings that Kent's extra-contractual claims must be dismissed, despite "that portion of the R&R correctly stat[ing] Texas law."[12] Kent does not object, however, to the Magistrate Judge's finding that Kent's loss is covered by the on-premises provision, "including that the Kent Loss was 'direct' according to that term's ordinary meaning and that the fraudsters committed 'theft' as that term is defined in the Policy."[13]

Travelers, on the other hand, largely agrees with the R&R. Traveler's sole objection is that the Magistrate Judge found Kent adequately stated a claim under the on-premises provision.[14] It urges the Court to exercise judicial restraint to avoid reaching this objection by holding that policy excludes the coverage Kent seeks.[15]

Given the parties together object to the entire R&R,[16] the Court reviews the Magistrate Judge's efforts de novo. Traveler's argument that the policy does not cover otherwise excludes Kent from coverage carries the day.

## II.    The Motion to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[17] At the pleading stage, the Court assumes that the plaintiff's factual allegations are true and must dismiss if they fail to "state a claim to relief that is

---

[12] ECF No. 17 at 8.

[13] ECF No. 17 at 8.

[14] ECF No. 18 at 2.

[15] *Id.*

[16] Save for Kent's "conditional" objection, which the Court reviews for clear error. *Post v. Comal Cnty., Texas*, No. SA-18-CV-01203-JKP, 2021 WL 1620815, at *1 (W.D. Tex. Jan. 6, 2021).

[17] FED. R. CIV. P. 8(a).

4

plausible on its face"[18] or fail "on the basis of a dispositive issue of law."[19] A claim is plausible on its face when it asserts facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."[20] A district court generally limits its examination "to the complaint, documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."[21] Therefore, the Court may properly examine the policy attached to an incorporated by reference into Kent's Amended Complaint.[22]

## DISCUSSION

Federal courts sitting in diversity over insurance policy matters like this one look to the substantive law of the forum state.[23] Texas courts construe insurance policies "according to the ordinary rules of contract construction."[24] Policy terms are given their plain, ordinary meaning "unless the policy itself shows that the parties intended the terms to have a different, technical meaning."[25] Terms defined by the policy are controlling.[26]

---

[18] *Amin v. United Parcel Serv., Inc.*, 66 F.4th 568, 572–73 (5th Cir. 2023) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).

[19] *Id.* (citing *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

[20] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[21] *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

[22] ECF No. 11 at; 11-1.

[23] See *Sentry Select Ins. Co. v. Lopez*, 241 F. Supp. 3d 777, 780 n.1 (W.D. Tex. 2017) (citing *Tex. Indus., Inc. v. Factory Mut. Ins. Co.*, 486 F.3d 844, 846 (5th Cir. 2007)).

[24] *Cen. Mut. Ins. Co. v. Reliance Prop. Mgmt., Inc.*, No. 05-21-00071-CV, 2022 WL 1657031, at *5 (Tex. App.—Dallas 2022, pet. filed) (citing *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)).

[25] *Great Am. Ins. Co. v. AFS/IBEX Fin. Servs., Inc.*, No. 3:07-CV-924-O, 2008 WL 2795205, at *5 (N.D. Tex. July 21, 2008) (citing *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999); *Puckett v. U.S. Fires Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984)).

[26] *Id.* (citing *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 823 (Tex. 1997)).

Whether policy language is ambiguous is a question of law.[27] Ambiguity "exists only when the contract is susceptible to two or more reasonable interpretations" and "cannot be created by introducing parol evidence of intent."[28] Courts construe ambiguous contracts in favor of the insured.[29] The same is true of ambiguous exclusionary language where the construction urged by the insured is reasonable, "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent."[30]

Finally, the insured must show that its claim might be covered by its policy and the insurer bears the burden of proving the applicability of any exclusions or limitations to coverage.[31]

## I.      Kent's claims brought under the policy.

The parties dispute whether Kent stated claims under several provisions: (1) the Forgery or Alteration Insuring Agreement,[32] (2) the On Premises Insuring Agreement,[33] (3) the Social Engineering Fraud Insuring Agreement,[34] and (4) two exclusionary provisions found in Exclusion R. The Court considers each in turn to determine whether Kent's complaint survives.

---

[27] *Cen. Mut. Ins.*, 2022 WL 1657031, at *5 (citing *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

[28] *Id.*

[29] *Great Am. Ins.*, 2008 WL 2795205, at *5.

[30] *Id.*

[31] *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 99 F.3d 695, 701 (5th Cir. 1996).

[32] ECF No. 13 at 9–10; ECF No. 11-1 at 82.

[33] ECF No. 13 at 13–14; ECF No. 11-1 at 82.

[34] ECF No. 13 at 15–16; ECF No. 11-1 at 110.

A. **Kent fails to bring a claim under the policy's Forgery or Alteration Insuring Agreement.**

The Policy's Forgery or Alteration Insuring Agreement provides:

> The Company will:
>> 1. pay the Insured for the Insured's direct loss directly caused by Forgery or alteration of, on or in any written Covered Instruments that are:
>>> a. made by, drawn by, or drawn upon, the Insured, or purport to have been so made or drawn; or
>>> b. made or drawn by one acting as the Insured's agent, or purport to have been so made or drawn. . . .[35]

Travelers first argues that Kent's claim is not covered by the Forgery or Alteration provision because the checks[36] were not "made on, drawn on, or drawn upon" Kent.[37] Instead, the Treasury was maker and drawer of the checks.[38] Kent disagrees. Kent argues that the checks it cashed became Kent's property through assignment.[39] This construction is logical. To pay the fraudsters cash, the check amounts were "drawn upon" Kent's bank account. Later, the check amounts were "drawn by" Kent on the Treasury when the checks were deposited into Kent's bank account. And Kent argues as much.[40]

More than twenty years ago, the Fifth Circuit in *Parkans* foreclosed Kent's argument when it rejected a district court's attempt to treat a third party as a drawee "simply because it was the party who ultimately suffered the loss."[41] That court was reluctant to apply the district court's expansive meaning, reasoning that "[i]n the commercial paper context the

---

[35] ECF No. 13 at 9–10; ECF No. 11-1 at 82.

[36] The parties do not dispute that the checks are "Covered Instruments" as defined elsewhere in the policy.

[37] ECF No. 13 at 10.

[38] *See id.*

[39] ECF No. 14 at 10–11.

[40] *Id.*

[41] *Parkans Int'l LLC v. Zurich Ins. Co.*, 299 F.3d 514, 517 (5th Cir. 2002).

phrases 'drawn by' and 'drawn upon' are not ambiguous and have definite legal meaning."[42]

Those definitions preclude this Court from placing Kent in either role. Going further, in a

matter much like *Parkans* (decided that same year and cited by *Parkans*), the Fifth Circuit in

*Baptist Health Systems* looked to the Texas Business in Commerce code for definitions that fall

in line with the common commercial use:

> A "maker" is "a person who signs or is identified in a note as a person undertaking to
> pay." TEX. BUS. & COMM.CODE § 3.103(a)(5). A "drawer" is "a person who signs
> or is identified in a draft as a person ordering payment." TEX. BUS. &
> COMM.CODE § 3.103(a)(3). A "drawer" is "one who directs a person or entity,
> usually a bank, to pay a sum of money stated in an instrument-for example, a person
> who writes a check; the maker of a note or draft." *Black's Law Dictionary* 510 (7th Ed.
> 1999).[43]

With these definitions in hand, Travelers argues that Kent could never be the drawer or

maker of the forged checks; the Treasury was.[44] The Court agrees. Kent's argument, though

it appeals to common sense, does not follow the more rigid commercial definitions the Fifth

Circuit has detailed and which place the Treasury as maker and drawer. As a result, Kent's

claim is not covered by the policy.

Kent's failure to show that the Forgery and Alteration Insuring Agreement covered

the loss amounts to a failure to state a claim under the same. The Court therefore

**DISMISSES** Kent's claim under this policy provision.

---

[42] *Id.*; *see also Travelers Cas. & Sur. Co. of Am. v. Baptist Health Sys.*, 313 F.3d 295, 299 (5th Cir.
2002) (holding the same and rejecting the Northern District of Indiana case, *Omnisource Corp.
v. CNA/Transcon. Ins. Co.*, 949 F. Supp. 681, 690 (N.D. Ind. 1996), on which the district
courts in *Baptist Health* and *Parkans* both relied.)
[43] *Baptist Health*, 313 F.3d 299 n.1.
[44] ECF No. 13 at 11.

**B.    Kent states a claim under the policy's On Premises Insuring Agreement (though an exclusion moots Kent's claim).**

In relevant part, the On Premises Insuring Agreement reads:

> The Company will pay the Insured for:
> 1. The Insured's direct loss of Money or Securities located inside the Premises or Financial Institution Premises directly caused by Theft committed by a person present inside such Premises or Financial Institution Premises. . . .[45]

The policy defines *Theft* as the "the intentional unlawful taking of Money and Securities to the Insured's deprivation."[46]

Travelers argues that the policy does not cover Kent's loss because the loss was neither direct (essentially, that the loss occurred only once the Treasury drafted Kent's bank account and not the moment Kent's cash checking services were duped) nor the result of the sort of "theft" defined by the policy.[47] Kent again disagrees with both.

As to *directness*, Kent is apt to point out that even if Travelers is correct that the loss occurred when the Treasury acted, "[t]here is no loss more direct or inevitable than when the US Government decides to reclaim funds as a direct result of fraud committed directly against a party using a fraudulently endorsed US Treasury check."[48] That said, the Court agrees that the loss occurred the moment "Kent exchanged cash for forged, valueless instruments" and "[t]hat the US Treasury paid and then later reclaimed the funds those checks purported to represent is immaterial to the immediacy and directness of Kent's

---

[45] ECF No. 13 at 13–14; ECF No. 11-1 at 82.
[46] *Id.* at 14; ECF No. 11-1 at 94.
[47] *Id.*
[48] ECF 14 at 13.

Loss."[49] Travelers cites the requirement that for a loss to be *direct* "it must be 'immediate' and without any intervening space, time, agency, or instrumentality."[50] Travelers' motion to dismiss reveals the flaws of its logic:

> Ultimately, if a payee did not report the Checks as missing, or if the United States Government had not chosen to reclaim the funds, Kent would never have suffered any loss.[51]

And in its objection to the R&R, Traveler's doubles down:

> [W]hen Kent received the Checks, no loss occurred. Moreover, Kent would have continued to retain the value of the Checks had any one of a series of events not occurred. First, the payees of the Checks had to report to the United States Government that they had not received them. Then, the Government had to determine that the Checks had been improperly cashed. Then, the Government had to send Kent notices of reclamation. Even after those three events involving numerous parties occurred, Kent had not suffered a loss. Only at some later unspecified date, when amounts were withdrawn from Kent's bank account and sent to the Government did Kent lose the value of the Checks. If even one of these four intervening acts had not occurred, Kent would still today retain the value of the Checks. Ultimately, if a payee did not report the Checks as missing, or if the Government had not chosen to reclaim the funds, Kent would never have suffered any loss.
> . . . .[52]

Despite Travelers' claim that the above series of actions intervene to forbid a finding of the requisite directness, the loss occurred at the exchange between the fraudsters and Kent. That the loss was only later realized upon the Treasury's reclamation is of no moment here.

*Theft* is a simpler matter. The fraud as described amounts to an "intentional unlawful taking of money" as contemplated by the policy on its face. And fraud vitiates everything it

---

[49] *Id.*

[50] *Tex. Ass'n of Sch. Bds., Inc. v. Travelers Cas. & Sur. Co. of Am.*, No. 1:15-cv-369-RP, 2016 WL 4257748, at *6 (W.D. Tex. July 7, 2016) (cleaned up).

[51] ECF No. 13 at 13.

[52] ECF No. 18 at 5.

touches.[53] That the taking occurred via a commercial exchange does not reform an unlawful act into a lawful one.[54] Without yet addressing the relevant exclusions, Kent has made a plausible claim for coverage under the On Premises Insuring Agreement.

> ### C.   Kent fails to state a claim under the Social Engineering Fraud Insuring Agreement.

The Social Engineering Fraud Insuring Agreement provides: "The Company will pay the Insured for the Insured's direct loss from the transferring, paying or delivering of Money or Securities, directly caused by Social Engineering Fraud."[55]

The policy defines *Social Engineering Fraud* as:

> [T]he intentional misleading of an Employee by a person purporting to be:
> 1. a Vendor
> 2. a Client;
> 3. an Employee; or
> 4. an Authorized Person.
> through the use of a Communication.[56]

The Policy defines *Communication* as:

> [A]n electronic, telegraphic, cable, teletype, telephonic voice, telefacsimile, or written instruction received by an Employee that:
> a. directs the Employee to transfer, pay, or deliver Money or Securities;
> b. contains a misrepresentation of a material fact; and
> c. is relied upon by the Employee, believing the material fact to be true.[57]

---

[53] *Italian Cowboy Partners, Ltd v. Prudential Ins. Co. of Am.*, 341 S.W.3d 23, 336 (Tex. 2011) ("fraud vitiates everything it touches").

[54] Travelers argues that "[t]he transfer of Kent's funds in exchange for something of value by one with authority surely cannot constitute a "taking" (i.e., theft) from Kent. Thus, the alleged fraudster(s) did not intentionally or unlawfully "take" anything from Kent, and Kent was not deprived of anything as a result." This argument borders on bad faith.

[55] ECF No. 13 at 15; ECF No. 11-1 at 110.

[56] ECF No 13 at 15–16; ECF No. 11-1 at 110.

[57] *Id.*; ECF No. 11-1 at 110.

Kent here fails to show that the policy covers its loss. The question is whether the fraudsters' checks amount to a communication as contemplated by the Social Engineering Fraud provision. Specifically, whether the checks were *instructions* that directed Kent employees to pay money. Travelers argues that the checks did not direct Kent or its employees to do anything.[58] Rather, the checks instructed the Treasury to pay the check's payee, which Kent became once the check was endorsed over to Kent.[59] Kent argues the Social Engineering provision applies because "individuals purporting to be 'Clients' misled Kent's employees using 'Communications'—fraudulently endorsed checks which are written instructions directing the payment or transfer of money—into transferring money which led to the direct loss of more than $74,000." Kent's argument fails because the checks do not instruct Kent or its employees to "transfer, pay, or deliver Money or Securities." Rather, they instruct the Treasury to pay. With this important nuance in mind, the Court **DISMISSES** Kent's claim under the Social Engineering Fraud Insuring Agreement.

### D.     Kent fails to state a claim given two operative exclusions.

Two exclusions independently remove any lingering doubt that Kent failed to state plausible claims under the policy. In relevant part, they are reproduced here:

> R. This Crime Policy will not apply to loss resulting directly or indirectly from:
>> 1. the giving or surrendering of Money, Securities or Other Property in any exchange or purchase, whether genuine or fictitious; or
>> 2. any other giving or surrendering of, or voluntary parting with, Money, Securities or Other Property, whether or not induced by any dishonest or fraudulent act . . .

---

[58] ECF No. 13 at 16.

[59] *Id.*

The first provision excludes loss that results directly or indirectly from the "giving or surrendering of Money, Securities, or Other Property in any exchange or purchase, whether genuine or fictitious."[60] Kent argues that the fraud it endured precludes a consensual, and therefore legitimate, "giving or surrendering of money."[61] The Court declines to read Kent's understanding of consent into Exclusion R.1's text where it does not exist. Nor do dictionary definitions of *give* and *surrender* echo the type of consent Kent argues for.[62] R.1. therefore excludes Kent's claims under the policy entirely because Kent granted (*i.e.*, gave or surrendered) cash to the fraudsters in exchange for the rights to stand in as payee. The Court **DISMISSES** Kent's claim under the On Premises Insuring Agreement.

As to Exclusion R.2., Kent argues that this so-called *voluntary parting* or *theft by trickery* exclusion would swallow the forgery coverage entirely: "Using Travelers' interpretation, few forgery losses, if any at all, could possibly be covered under the insuring agreements for which Exclusion R. does not make an exception."[63] Perhaps. Given a sniff test, these types of exclusions carry the potential to effectuate sham coverage and likewise may smack of being against public policy. Had Kent brought plausible claims under the policy coverage the

---

[60] ECF No. 13 at 4; ECF No. 11-1 at 112.

[61] ECF No. 14 at 9.

[62] Merriam-Webster defines *give* as: "to grant or bestow by formal action, to put into the possession of another for his or her use, and to transfer from one's authority or custody." *Give*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/give (last accessed September 19, 2023) (cleaned up). Merriam-Webster defines *surrender* as: "to yield to the power, control, or possession of another upon compulsion or demand, and the action of yielding one's person or giving up the possession of something especially into the power of another." *Surrender*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/surrender (last accessed September 19, 2023) (cleaned up).

[63] *Id.* at 7.

Court might have undertaken analysis to determine whether the exclusions are unreconcilable with the policy.[64] It need not do so today.

## II.   Kent's remaining, extracontractual claims are dismissed.

What remains are Kent's claims for common law bad faith, breach of the duty of good faith and fair dealing, failure to comply with the Texas Insurance Code's prompt payment statute, and unfair or deceptive acts or practices under the Texas Insurance Code. By conditionally objecting to the Magistrate Judge's recommendation to dismiss Kent's extracontractual claims, Kent did not properly object. Therefore, the Court reviewed this portion of the R&R and found it neither clearly erroneous nor contrary to law. Because Kent failed to plead a claim under the policy, its extracontractual claims fail as a matter of law.[65] Therefore, the Court **DISMISSES** Kent's remaining, extracontractual claims.

### CONCLUSION

For the reasons stated above, the Court **ORDERS** that the United States Magistrate Judge's R&R[66] is **ADOPTED**.

---

[64] *See Cen. Mut. Ins.,* 2022 WL 1657031 at *13 (Tex. App. May 25, 2022) (finding where policy provisions could not be reconciled with and exclusion, the policy language controlled).
[65] *See State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010) ("When the issue of coverage is resolved in the insurer's favor, extra-contractual claims do not survive.").
[66] ECF No. 16.

14

Accordingly, the Court **GRANTS** Travelers' Motion to Dismiss[67] and the Court **ORDERS** that this matter be **DISMISSED** with prejudice.

It is so **ORDERED.**

**SIGNED this 21st day of September, 2023.**

**DAVID COUNTS**
**UNITED STATES DISTRICT JUDGE**

---

[67] ECF No. 13.